**FILED**

SEP 1 8 2024

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  **4:24CR489 MTS/SPM** |
| | ) |
| SIDARTH "SID" CHAKRAVERTY, | ) |
| | ) |
| VICTOR ALSTON, and | ) |
| | ) |
| SHIJING "POPPY" CAO, | ) |
| | ) |
| Defendants. | ) |

## INDICTMENT

**Introduction.**

At all times relevant to the Indictment:

1.     The Defendants, **SIDARTH "SID" CHAKRAVERTY** (hereinafter referred to as "**CHAKRAVERTY**") and **VICTOR ALSTON** (hereinafter referred to as "**ALSTON**"), along with one or more other individuals, were co-owners, managers and operators of a number of affiliated companies, including but not limited to:   Big Sur Construction, LLC, a construction management and development company primarily engaged in the management of the construction and the building of multifamily apartment developments; LuxLiving, LLC, a real estate development company which primarily handled the development, brokerage, daily management, marketing, and lease-up of multifamily apartment developments built by Big Sur Construction, LLC; Rainier One, LLC, the entity established for the ownership, development, and management of the Chelsea multi-family apartment redevelopment (hereinafter referred to as "Chelsea"), located in the Pershing-DeBaliviere neighborhood of St. Louis; SoHo-El Capitan One, LLC, the entity established for the ownership, development, and management of the SoHo multi-family apartment redevelopment (hereinafter referred to as "SoHo"), located in the Soulard neighborhood

of St. Louis; and, Revival STL Construction, LLC, the entity which handled renovations and repairs to Defendants' apartment units (together, these companies are hereinafter referred to cumulatively as "Big Sur").    As co-owners, managers, and operators of Big Sur, **CHAKRAVERTY** and **ALSTON** were involved in running the day-to-day operations of these various affiliated companies, including for the Chelsea and SoHo redevelopment and construction projects.

2.    Defendant **SHIJING "POPPY" CAO** (hereinafter referred to as "**CAO**"), was the chief in-house accountant for the Big Sur affiliated companies, a role that included managing all project accounts and all project purchasing, managing accounts payable and accounts receivable, issuing checks, and preparing vendor lien waivers, as well as supervising the accounting staff.

3.    **CHAKRAVERTY, ALSTON,** and **CAO** directed the actions and activities of numerous employees of the various Big Sur affiliated companies relative to the charges contained within the Indictment (hereinafter referred to as "Big Sur Employees").

**The City's MBE and WBE Program.**

4.    The City of St. Louis, Missouri established participation goals for the hiring of qualified Minority Business Enterprise companies (hereinafter referred to as "MBE"), and Women Owned Business Enterprise companies (hereinafter referred to as "WBE") as contractors and subcontractors on real estate development projects which involved City tax incentives, such as Chelsea and SoHo.    Those tax incentives included sales tax exemption on the purchase of construction materials, as well as property tax abatement once the development projects were completed.    These MBE and WBE participation goals sought to address historical social and economic disadvantages experienced by women and minority group members, and to reduce barriers to and foster participation by women owned businesses and minority owned businesses in construction projects located in the City.

5.      The St. Louis Development Corporation (hereinafter referred to as "SLDC") was the entity which reviewed proposals for redevelopment projects within the City of St. Louis and made recommendations to the City's Board of Aldermen and to the Mayor regarding requests for tax incentives.    Once the Board of Aldermen and the Mayor approved tax incentives for a redevelopment project, the SLDC was the entity which enforced compliance with the City's MBE and WBE participation goals.    Specifically, the owner of a redevelopment project reported its utilization of MBE and WBE companies to the SLDC, which determined whether the project had sufficiently met the City's MBE and WBE participation goals in order to receive the City tax incentives.

6.      Both Chelsea and SoHo received tax incentives from the City of St. Louis.    Both redevelopment projects had goals established by the City for the participation and utilization of MBE and WBE companies for labor and material supplies on the projects in order to qualify for the tax incentives.    Big Sur was required to accurately and truthfully report the actual utilization of MBE and WBE companies on those projects to the SLDC, along with all non-MBE and non-WBE companies which also did work or supplied materials on the projects.

7.      **CHAKRAVERTY, ALSTON** and **CAO** well knew and understood the City's MBE/WBE program and its participation goals, as Big Sur Investments, LLC, another Big Sur affiliated company, had been certified as a *Subcontinent Asian American* MBE on August 29, 2017 specifically for the purpose of new multi-family housing construction and residential remodelers. Further, previous Big Sur developments had received City tax incentives based in part upon purported use of MBE and WBE subcontractors on those construction projects.    Defendants were also aware that City of St. Louis and SLDC MBE/WBE program guidelines, incorporating the Mayor's Executive Order and City Ordinances allowing for the tax incentives, required that an MBE and/or a WBE "perform a commercially useful function" in order to receive credit for its

3

supply of labor and/or materials. The MBE or WBE must be "...responsible for a distinct element of the work of a contract, and carries out its responsibilities by actually performing, managing and supervising the work." SLDC's Manager of Contract Compliance, V.M., personally spoke with **CHAKRAVERTY** and **ALSTON** prior to each Big Sur project to ensure that they understood the specific MBE/WBE participation goals.

## COUNT ONE

### Conspiracy to Commit Wire Fraud

8.      The allegations contained in the preceding paragraphs 1 through 7 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

9.      From at least as early as in or about January 2019 through at least as late as in or about October 2023, in the Eastern District of Missouri and elsewhere,

### SIDARTH "SID" CHAKRAVERTY,

### VICTOR ALSTON, and

### SHIJING "POPPY" CAO,

the Defendants herein, along with others known and unknown to the Grand Jury, combined, conspired, and agreed together and with each other to commit wire fraud; that is, the Defendants devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false or fraudulent pretenses, representations, or promises, and for the purpose of executing the scheme and artifice and attempting to do so used or caused to be used an interstate wire communication, in violation of Title 18, United States Code, Section 1349.

### Purpose and Object of the Conspiracy

10.     It was a purpose and an object of the conspiracy that Defendants, and Big Sur Employees acting at Defendants' direction, would and did submit documents containing false information and make false representations to representatives of the City of St. Louis, SLDC as to

4

the participation and utilization of MBE or WBE companies on Chelsea and SoHo redevelopment and construction projects to obtain City tax incentives in the form of sales tax exemptions on the purchase of construction materials, as well as property tax abatements.

## Manner and Means

11.     The manner and means by which Defendants sought to accomplish the purpose and object of the conspiracy included the following, among others, which were committed and caused to be committed in the Eastern District of Missouri:

### Chelsea Fraud.

12.     On or about June 2, 2019, the City of St. Louis enacted Ordinance number 70955, approving 10 years of Tax Abatement for Chelsea.    The Ordinance required that the redevelopment project "...be bound by the conditions and procedures regarding the utilization of MBE's and WBE's established by the City."    On Chelsea, the City's participation goals were 25% for MBEs and 5% for WBEs to qualify for property tax abatement and sales tax exemption for materials utilized in the construction.    On September 17, 2019, **CAO**, **ALSTON**, and **CHAKRAVERTY** sent the initial Utilization Plan to SLDC by email which reflected the 25% MBE and 5% WBE participation goals for Chelsea.    On September 19, 2019, **ALSTON, CHAKRAVERTY**, and **CAO** met with representatives of SLDC who provided Defendants with information as to the MBE and WBE participation goals as they applied to Chelsea.    Following the meeting, in a follow up email, on or about September 20, 2019, **ALSTON** advised SLDC that, "Sid has a goal to get the women participation up on [Chelsea].    We will try to get it past 500K." The City Ordinances setting out these participation goals were set forth in the Chelsea Redevelopment Agreement signed and executed on December 12, 2019 by **ALSTON**, as Manager of Ranier One, LLC.

13.    Because Big Sur was itself certified as a *Subcontinent Asian American* MBE, its own reported labor and material supplies made up the majority of MBE participation on Chelsea. Thus, there was no need for Defendants and Big Sur Employees, at Defendants' direction, to recruit and use *African American* MBEs to meet the City's MBE participation goals on Chelsea. Construction on Chelsea began during 2019, and was completed during 2021.

**C.C.'s WBE Company.**

14.    A WBE company owned by an individual whose identity is known to the Grand Jury (hereinafter referred to as "C.C.") supplied labor and materials to clean the apartment units at Chelsea during construction under a direct subcontract with Big Sur.    C.C.'s WBE was paid approximately $21,504.00 for the actual cleaning services it provided on Chelsea.    In reporting to SLDC, Defendants and Big Sur Employees, at Defendants' direction, falsely represented and credited an additional approximately $272,393.27 in materials and labor as having been purchased and supplied by C.C.'s WBE.    Those additional materials and labor included, but were not limited to, insulation, doors, windows, retaining walls, and landscaping.    C.C.'s WBE had no involvement in the ordering, purchasing, or supplying of those additional materials and/or labor, nor did C.C.'s company have any true joint venture, joint business or contractual relationship with the non-WBE companies which actually provided those materials and/or labor.

**Sham Joint Checks.**

15.    In an effort to conceal their scheme, and in carrying it out, Defendants and Big Sur Employees, at Defendants' direction, issued sham "joint checks" (through Big Sur Construction, LLC) in the names of both C.C.'s WBE and a number of non-WBE companies which had actually purchased and supplied materials and provided labor on Chelsea.    The "joint checks" were provided to the non-WBE companies in payment of the non-WBE companies' actual charges for labor and materials.    C.C.'s WBE and the non-WBE companies had no actual relationship, did

6

not perform any joint work on Chelsea, and were not involved in jointly ordering, purchasing, or supplying any construction materials on the project. C.C.'s WBE received no portion of the proceeds from these "joint checks."

16.      Defendants discussed issuing "joint checks" and falsely crediting C.C.'s WBE with the purchases of materials actually made by non-WBE companies at least as early as December, 2020. On December 2, 2020, **CAO** directed a Big Sur Employee via email, "We need to list all materials payments and pay thru [C.C.]." In that same email conversation, **CHAKRAVERTY** directed **CAO** via email, "We need to get 3.5% - 4% pls tell me what we can pay through [C.C.]." On December 4, 2020, in response, the Big Sur Employee advised **CHAKRAVERTY** and **CAO**, via email "…Here the companies with larger $ amounts material might be willing to do the joint check," while including a list of 10 non-WBE companies which were still owed money for materials and labor which those companies had already provided on the project with no involvement of C.C.'s WBE. On December 23, 2020, the Big Sur Employee advised **ALSTON** and **CHAKRAVERTY** via email of an outstanding invoice from a non-WBE company which had already provided labor and materials for the construction of retaining walls on the project, "From the last bills meeting, we held his bill and needed to do a joint check with someone." **CAO** also participated in this email chain. In response, **ALSTON** approved issuance of the "joint check", stating via email, "ok w me." A "joint check" was then issued on December 30, 2020 in the names of the non-WBE company and C.C.'s WBE to pay the amount of the outstanding invoice from the non-WBE company of $12,235.30. On December 30, 2020, **CHAKRAVERTY** directed **CAO** via email, "Poppy just go ahead and get the joint checks signed off on everything you can thx." Beginning on December 30, 2020, a series of "joint checks" were then issued in the names of a number of non-WBE companies and C.C.'s WBE to pay the non-WBE companies'

outstanding invoices for such things as the construction of retaining walls, and the supply and installation of windows.    C.C.'s WBE received none of those funds.

17.    On May 24, 2021, during the period of time that the final reporting was being made by Big Sur to SLDC in support of the City tax incentives, Defendants continued discussing the need to issue additional "joint checks" to further falsely inflate the purported WBE utilization on Chelsea.    As **ALSTON** advised SLDC via email, construction on Chelsea was substantially complete at that time.    **ALSTON** directed a Big Sur Employee via email, "just get the wbe to 1-2%."    In response, on May 25, 2021, the Big Sur Employee advised **ALSTON** via email, "I am still looking for the vendor where we can do the joint check with the wbe vendor to increase the %."    Later on that same date, the Big Sur Employee advised **ALSTON**, **CHAKRAVERTY**, and **CAO** via email, "Here are the list for the vendors we can do joint check with wbe vendor.    I am not sure if ["Company One"] and ["Company Two"] are willing to do joint check.    If they all agree to do the joint check, the % of wbe will be at 1.24%."    The list of vendors provided by the Big Sur Employee to Defendants were all non-WBE companies which had supplied labor and materials during construction with no involvement of C.C.'s WBE, but which had not yet received final payment from Big Sur.    On June 8, 2021, in an email to the Big Sur Employee, **ALSTON,** and **CHAKRAVERTY**, **CAO** directed the Big Sur employee, "can you list everyone we need to pay thru ["C.C."]?    I talked to "C.T." [the non-WBE company which supplied insulation materials on the project] today.    We will see if they will agree."    On June 9, 2021, at Defendants' direction, Big Sur then issued five "joint checks" in the names of five separate non-WBE companies and C.C.'s WBE to pay the non-WBE companies' outstanding invoices for such things as the construction of retaining walls, landscaping, the supply and installation of insulation materials, and the supply of doors totaling approximately $208,465.21.    Relative to four of those "joint checks", Defendants caused false information to be submitted to the SLDC claiming that

8

additional amount as having been paid to C.C.'s WBE when, in fact, those four "joint checks" were provided to the non-WBE companies for their actual charges for materials and labor on the project. C.C.'s WBE received none of those funds, and C.C. had no knowledge of the false reporting to SLDC.

**False Utilization Reports to SLDC.**

18.     Beginning on or about October 9, 2019, Defendants and Big Sur Employees, at Defendants' direction, caused information to be submitted by email to SLDC in the form of "Utilization Reports," some of which contained false information.   The Utilization Reports were required to be submitted to SLDC at the beginning of the Chelsea construction, and throughout the construction phase, to advise SLDC of Big Sur's anticipated and ongoing utilization of subcontractors on the redevelopment project, including any MBEs and WBEs.     On June 14, 2021, for the first time in any of the Utilization Reports, C.C.'s WBE was falsely represented as supplying $293,897.27 in labor and materials on the Chelsea as a WBE.    Defendants and Big Sur Employees, at Defendants' direction, falsely omitted the full amount of labor and materials supplied by a number of non-WBE companies from the June 14, 2021 Utilization Report to conceal from SLDC that those non-WBE companies were actually providing labor and supplying materials which the Utilization Report, in part, falsely attributed to C.C.'s WBE.    Further, a Big Sur check in the amount of $45,967.00 was included in that total attributed to C.C.'s WBE in the Utilization Report, but that check had been voided by Big Sur and that amount was never paid out to C.C. or any other subcontractor.    At no time was true and accurate information provided on any version of the Chelsea Utilization Reports disclosing C.C.'s WBE's actual work on Chelsea, or the full amount of non-WBEs' actual work on Chelsea.    C.C. had no knowledge of the false Utilization Reports.

**Additional False Information to SLDC.**

19.     Separate and apart from the Utilization Reports, in reporting to the SLDC through the internet based Global Project Tracking System (hereinafter referred to as "GPTS") as the Chelsea construction proceeded, Defendants and Big Sur Employees, at Defendants' direction, caused false information to be submitted to SLDC which falsely credited C.C.'s WBE company as having supplied labor and materials valued at approximately $293,897.27, when C.C.'s WBE cleaning company was paid only approximately $21,504.00 for cleaning services.     The information falsely omitted the full amount of labor and materials supplied by non-WBE companies which was, in part, falsely attributed to C.C.'s WBE company.

**False Final Lien Waiver.**

20.     SLDC required that a "final lien waiver" be submitted by Big Sur for each company which had supplied labor and/or materials on Chelsea to verify that each company had received full and final payment from Big Sur, and to ensure that the amounts verified in GPTS were accurate.     On both June 14, 2021 and July 1, 2021, Defendants, and Big Sur Employees at Defendants' direction, caused a false final lien waiver to be submitted via email to SLDC which falsely identified labor and material costs in the amount of $293,897.27 as having purportedly been supplied by C.C.'s WBE.     Thus, SLDC was falsely led to believe that C.C.'s WBE had been paid $293,897.27 for supplying materials and labor on Chelsea when, in fact, C.C.'s WBE had been paid only approximately $21,504.00 for its cleaning services.

**False Good Faith Narrative.**

21.     On July 16, 2021, **CAO** submitted via email a "Good Faith Narrative" to **CHAKRAVERTY** and SLDC to convince SLDC that Big Sur had made a good faith effort to meet the WBE participation goal of 5% to be awarded the property tax abatement.     In that document, **CHAKRAVERTY** made false representations that Big Sur had "...improved our WBE

10

participation dramatically from our previous projects." While Defendants claimed to have achieved a WBE participation on Chelsea of 1.5%, Defendants failed to disclose that approximately 93% of that participation figure was comprised of the false attribution of $272,393.27 in materials and labor costs to C.C.'s WBE. The false "Good Faith Narrative" was relied upon by SLDC in determining that Big Sur had sufficiently complied with the WBE participation goals to award the City tax incentives on Chelsea.

**City Tax Incentives.**

22.    Falsely representing the value of construction materials and labor as having been purchased and supplied by C.C.'s WBE allowed Defendants and Big Sur to report to SLDC materially higher WBE participation in an attempt to meet the City's participation goals for the utilization of WBEs on Chelsea. SLDC relied upon that false information in approving Chelsea for a property tax abatement as well as a sales tax exemption for the value of materials utilized in the construction of the Chelsea. As certified to SLDC by **ALSTON**, Big Sur received approximately at least $551,022.99 in sales tax exemption for materials purchased and used in the construction of the Chelsea. Further, Big Sur received a property tax abatement valued at approximately $1,750,071.88 for Chelsea.

**SoHo Fraud.**

23.    On or about June 7, 2020, the City of St. Louis enacted Ordinance number 71145, approving 10 years of Tax Abatement for SoHo. As with the Ordinance covering Chelsea, the Ordinance for SoHo required that the redevelopment project "...be bound by the conditions and procedures regarding the utilization of MBEs and WBEs established by the City." While the City's MBE/WBE guidelines required general MBE participation on Chelsea, those guidelines had been revised by City Ordinance 70767 at the time of SoHo to specifically set a 21% participation goal by *African American* MBEs. Thus, labor and materials supplied by Big Sur, certified solely

11

as a *Subcontinent Asian American* MBE, could not count toward meeting the updated participation goal of *African American* MBEs on SoHo, as it had on Chelsea under the general MBE requirement.    In order to be eligible for City tax incentives on SoHo, along with the 21% African American MBE participation goal, a 11% participation goal for WBEs was set, as well as a 0.5% participation goal for Native American MBEs, facts known by **CHAKRAVERTY, ALSTON,** and **CAO**.    The City Ordinances detailing those participation goals were clearly set forth in the SoHo Redevelopment Agreement signed and executed on June 5, 2020 by **ALSTON**, as Managing Member of SoHo-El Capitan One, LLC.    On March 31, 2020, Defendants had calculated the value of the potential tax abatement at $7,037,714.00 over 10 years.    Construction on SoHo began during 2020 and was completed during 2023.

**C.C.'s WBE Company.**

24.    C.C.'s WBE once again provided labor and materials to clean the apartment units at SoHo during construction, and was paid approximately $60,780.00 for its labor and materials. In reporting to SLDC through the GPTS system, Defendants and Big Sur Employees, at Defendants' direction, falsely attributed approximately $1,150,721.00 in the cost of additional materials and labor supplied by non-WBE companies to C.C.'s WBE.    C.C.'s WBE had nothing whatsoever to do with ordering, purchasing, or supplying those additional materials and labor falsely attributed to C.C.'s WBE, nor did C.C.'s WBE have any true joint venture, joint business or contractual relationship with the non-WBE companies which actually supplied those materials and labor.

**SLE's African American MBE Company.**

25.    Because Big Sur did not qualify as an *African American* MBE on SoHo, Defendants and Big Sur Employees, at Defendants' direction, sought other means to meet the 21% participation goal for African American MBEs on the project.    During in or about May, 2022,

**CHAKRAVERTY** personally met with the owner of an African American MBE which supplied electrical workers and materials in the St. Louis area. **CHAKRAVERTY** offered the owner $10,000.00 to allow Big Sur to represent and credit that African American MBE with supplying labor and materials which were actually supplied by non-African American MBEs on SoHo. The owner of that African American MBE refused and turned down **CHAKRAVERTY's** offer. At that time, there was an African American MBE company (hereinafter referred to as "SLE") which was already supplying electrical workers and materials on SoHo under a direct subcontract with Big Sur. By the completion of SoHo, SLE was paid a total of approximately $2,954,696.28 by Big Sur for its actual labor and materials supplied.

26. After having been rejected by the first African American MBE, **CHAKRAVERTY** personally met with representatives of SLE and offered and agreed to pay SLE a 5% "markup" fee on cost of labor and construction materials ordered, purchased and supplied by a number of non-African American MBE companies on SoHo. Defendants and Big Sur Employees, at Defendants' direction, falsely attributed to SLE approximately $2,171,440.48 in the cost of additional materials and labor supplied by non-MBE companies in reporting to SLDC through the GPTS system. SLE's African American MBE had nothing whatsoever to do with ordering, purchasing, or supplying the additional materials and labor falsely attributed to SLE's African American MBE in reporting to SLDC, nor did SLE have any true joint venture, joint business or contractual relationship with the non-MBE companies which actually provided the various materials and labor. SLE verified those additional payments in the GPTS system after receiving proof from Big Sur that the companies which had actually supplied those materials and labor had been paid. Defendants caused separate checks to be issued, through SoHo-El Capitan One, LLC, to SLE for the additional "markup" payments. For example, on or about between April 14, 2023 and April 21, 2023, Big Sur issued two checks from SoHo-El Capitan One, LLC to

SLE totaling $45,845.53 as a purported 5% "markup" fee relative to approximately $916,910.54 in labor and construction materials supplied by non-African American MBE companies on SoHo which SLE had no involvement in ordering, purchasing, or supplying, but which was falsely attributed to SLE in Big Sur's reporting to the SLDC.    SLE received a total of approximately $77,328.81 in "markup" fees relative to materials and labor provided by non-MBE companies on SoHo, but which materials and labor were falsely attributed to SLE by Defendants in reporting to SLDC.    SLE had no knowledge that Defendants and Big Sur Employees, at Defendants' direction, were taking credit for MBE participation in its reporting to SLDC of those additional payments made to non-MBE companies.

**OC's Native American MBE Company.**

27.    The SoHo project also had a participation goal of 0.5% for *Native American* MBE companies.    During September, 2022, **CHAKRAVERTY** personally met with the owner of a Native American MBE (hereinafter the company is referred to as "OC"), and offered and agreed to pay that company a fee of 6% of the charges for construction materials and labor which were to be supplied by a non-Native American MBE, but attributed to OC in reporting to SLDC. **CHAKRAVERTY** directed the owner of OC to sign a September 8, 2022 Big Sur "joint purchase order" for landscape pavers in the amount of $72,581.16.    That September 8, 2022 Big Sur "joint purchase order" for the landscape pavers was simply a duplicate of an August 11, 2022 Big Sur purchase order in the same amount of $72,581.16 previously executed between Big Sur and the non-MBE company which was to actually provide the landscape pavers on SoHo.    Defendants and Big Sur Employees, at Defendants' direction, then caused false information to be submitted to SLDC crediting the OC Native American MBE company as having supplied approximately $73,000.00 in landscape pavers on SoHo when, in fact, the non-Native American MBE company had supplied those landscape pavers.    OC had nothing whatsoever to do with ordering,

purchasing, or supplying those landscape pavers, nor did OC have any true joint venture, joint business or contractual relationship with the non-Native American MBE company which actually provided those landscape pavers.   On November 15, 2022, Defendants caused a check to be issued, through SoHo-El Capitan One, LLC, in the amount of $72,581.76 to the non-Native American MBE company in payment for the landscape pavers it was to supply on SoHo.   On that same date, Defendants caused a check to be issued, again through SoHo-El Capitan One, LLC, to OC in the amount of $4,354.91 as a purported "professional fee."   The fee paid to OC was the agreed upon 6% of the charge for the landscape pavers which were supplied by the non-Native American MBE, and which was falsely attributed to OC in Big Sur's reporting to SLDC.   The non-Native American MBE company which actually supplied the landscape pavers was never disclosed by Defendants and Big Sur Employees in reporting to SLDC.

**Sham Joint Checks and Sham Joint Purchase Orders.**

28.    Just as with Chelsea, in an effort to conceal their scheme and in carrying it out, Defendants and Big Sur Employees, at Defendants' direction, issued sham "joint checks" (through SoHo-El Capitan One, LLC) and sham "joint purchase orders," sometimes referred to as "joint contracts," on SoHo in the names of both C.C.'s WBE and a number of non-WBEs; in the names of both SLE's African American MBE and a number of non-African American MBEs; and in the names of both OC's Native American MBE and the non-Native American MBE.   C.C.'s WBE, SLE's African American MBE, and OC's Native American MBE had no actual relationship, did not perform any joint work, and were not involved with the non-WBEs, the non-African American MBEs, and the non-Native American MBE in ordering, purchasing, or supplying any construction material or labor on SoHo.   C.C.'s WBE, SLE's African American MBE, and OC's Native American MBE received no portion of the proceeds from these "joint checks."   As **CAO** advised **CHAKRAVERTY** and a Big Sur Employee by email on April 15, 2022, "These are the payments

we need joint checks.    Pls make sure we don't pay these [actual] vendors directly."    In response, **CHAKRAVERTY** stated, "we have to create joint contracts for all of these."

　　　　**False Utilization Reports to SLDC.**

　　　　29.　　　Beginning on or about September 9, 2021, Defendants and Big Sur Employees, at Defendants' direction, caused false information to be submitted to SLDC via email in the form of "Utilization Reports" on SoHo.    Just as on Chelsea, the Utilization Reports were required to be submitted to SLDC at the commencement of the SoHo construction, and throughout the construction phase, to advise SLDC of Big Sur's anticipated and ongoing utilization of subcontractors on the redevelopment project, including any MBEs and/or WBEs.    Between September 9, 2021 and May 8, 2023, there were approximately thirteen (13) Utilization Reports which contained false information submitted by email by Defendants and Big Sur Employees, at Defendants' direction, to SLDC.    The false information in one or more of the submitted Utilization Reports included, but was not limited to, such things as: C.C.'s WBE contracted to supply $1,000,000 in "Cleaning & Materials"; C.C.'s WBE contracted to supply $1,665,155.63 in "Landscaping & Flooring materials"; SLE's African American MBE contracted to supply an additional $6,147,923.23 for "Temporary service"; SLE's MBE contracted to supply $4,371,424.39 in labor and materials; and, OC Native American MBE contracted to supply $73,000 in "Landscape pavers".

　　　　30.　　　C.C.'s WBE only supplied labor and materials to clean SoHo apartments during construction and was paid approximately $60,780.00 for that work.    C.C.'s WBE did not legitimately contract to supply any other labor or materials on SoHo and was not paid to supply any other labor or materials on SoHo, including any labor or materials for "Landscaping & Flooring materials."    SLE was paid a total of approximately $2,954,696.28 by Big Sur for its actual labor and materials supplied as an electrical subcontractor on SoHo.    SLE's African

16

American MBE did not legitimately contract to supply an additional $6,147,923.23 for "Temporary service," nor was it ever legitimately contracted to supply $4,371,424.39 in labor and materials.    OC's Native American MBE never legitimately contracted to supply $73,000 in "Landscape pavers" on SoHo, did not supply any labor and materials on SoHo, and was not paid to supply labor and materials on SoHo.    Defendants and Big Sur Employees, at Defendants' direction, falsely omitted the full amount of materials and labor supplied by non-WBE companies, non-African American MBE companies, and the non-Native American MBE company from one or more of the Utilization Reports in order to conceal from SLDC that those companies were actually supplying some or all of the labor and materials which the Utilization Reports falsely attributed to C.C.'s WBE, SLE's African American MBE, or the OC Native American MBE.

**Additional False Reporting to the SLDC.**

31.    Separate and apart from the Utilization Reports, as the SoHo construction proceeded, Defendants and Big Sur Employees, at Defendants' direction, caused false information to be submitted to SLDC through the GPTS system.    That information falsely credited C.C.'s WBE company as having purchased and supplied materials and labor valued at approximately $1,211,501.00, when C.C.'s company was only paid approximately $60,780.00 on SoHo.    That information also falsely credited SLE's African American MBE as having purchased and supplied materials and labor valued at approximately $5,278,679.00 on SoHo, when SLE, and its one legitimate subcontractor, were only paid approximately $3,192,506.28 for actual labor and materials supplied on SoHo.    Additionally, the false information submitted to SLDC by Big Sur omitted a number of non-WBE companies and non-African American MBE companies when, in fact, those companies had provided a substantial portion of the labor and materials attributed to C.C.'s WBE company and SLE's African American MBE.    As just one example, on or about August 24, 2021, Big Sur, through its affiliated company SoHo-El Capitan One LLC, paid The

Home Depot $1,047,495.45 for appliances which Big Sur itself had ordered and purchased from The Home Depot for SoHo. However, in Big Sur's reporting to SLDC, that payment to The Home Depot was not attributed to Big Sur or The Home Depot, it was falsely attributed to SLE, which had nothing whatsoever to do with ordering, purchasing, or supplying those appliances.

**Big Sur's Reporting to its Lending Bank and Disbursing Agent.**

32.    Midwest BankCentre loaned funds to Big Sur, through SoHo-El Capitan One, LLC, for construction of SoHo. Old Republic Title Company of St. Louis, Inc. (hereinafter referred to as "Old Republic") served as the disbursing agent of the funds loaned by Midwest BankCentre on SoHo. Periodically, Big Sur, through SoHo-El Capitan One, LLC, provided draw requests to Old Republic with a list of subcontractors to be paid for labor and materials supplied on SoHo, along with the subcontractors' lien waivers, invoices, or other records associated with those requested payments. Based upon those Big Sur draw requests, Old Republic and Midwest BankCentre then disbursed funds to pay the identified subcontractors. Big Sur's reporting to Midwest BankCentre and Old Republic as to subcontractors which provided labor or materials on SoHo differed substantially from Big Sur's false reporting to SLDC. As one example, on or about July 15, 2021, in its reporting to SLDC through the GPTS system, Defendants and Big Sur Employees, at Defendants' direction, falsely reported payments purportedly made to C.C.'s WBE in the total amount of $511,634.00. However, in its reporting to Old Republic and Midwest BankCentre, Defendants and Big Sur employees, at Defendants' direction, submitted a draw request directing the bank to make two international wire transfers, which included that $511,634.00, to two Chinese companies which had actually supplied the materials which were falsely credited to C.C.'s WBE in the reporting to SLDC. **CAO** provided Old Republic and Midwest BankCentre via email with the international wire instructions in order for the bank to wire the funds to the foreign bank accounts for Shenzhenshi DIDU Trading Company and Xiamen KA United Import & Export

Company, Ltd., both companies being located in mainland China. C.C.'s cleaning company received none of the funds from either of those two international wire transfers. As another example, on or about March 21, 2022, in its reporting to SLDC through the GPTS system, Defendants and Big Sur Employees, at Defendants' direction, falsely reported a payment purportedly made to SLE's MBE in the amount of $250,000.00. In its reporting to Old Republic and Midwest BankCentre, however, Defendants and Big Sur employees, at Defendants' direction, submitted a March 21, 2022 draw request directing that $250,000 be disbursed to a non-MBE company for labor and materials that company had actually provided on SoHo, but which was falsely credited to SLE's MBE in the reporting to SLDC. SLE received none of the funds from that $250,000 disbursement to the non-MBE company.

**Big Sur's Continued Efforts To Obtain City Tax Incentives.**

33.    Beginning as early as on or about October 6, 2022, SLDC employees and administrators developed concerns as to potential false reporting on the part of Big Sur as to purported payments to C.C.'s WBE. Defendants knew that in order for SLDC to allow Big Sur credit for C.C.'s WBE's purported supply of materials and labor on SoHo, C.C. needed to verify the falsely inflated payment information which Defendants had caused to be reported to SLDC through the GPTS system, but C.C. refused to verify those falsely inflated amounts. On October 26, 2022, a Big Sur employee, at **ALSTON's** direction, presented a slide presentation along with **CHAKRAVERTY** to SLDC which falsely attributed a contract valued at $1,665,155.63 for the cost of materials and labor to C.C.'s WBE. Defendants' concern that SLDC would not approve the tax abatement continued into November and December, 2022. As **ALSTON** advised **CHAKRAVERTY** and **CAO** via email on November 4, 2022, "I doubt we will get our approval." A meeting between Big Sur and SLDC was then scheduled in order to discuss the final participation numbers on SoHo and the potential tax abatement. **ALSTON** communicated to

**CHAKRAVERTY** and a Big Sur Employee on November 8, 2022 via email, "Guys fix this stuff. We have 5M [$5,000,000.00] on the line tomorrow…this was raised over a month ago…bring [C.C.] in and fix it today." **CHAKRAVERTY** then directed the Big Sur Employee via email, "Set a time for us to meet [C.C.] today at the office." Despite Defendants' efforts, C.C. continued to refuse to verify the false information which had been reported to SLDC. Nonetheless, during the SLDC meeting, Defendants and Big Sur Employees, at Defendants' direction, presented information to SLDC again falsely reflecting that C.C.'s WBE had a contract to be paid $1,665,155.63 on SoHo. Because C.C. continued to refuse to verify the false information reported to SLDC, on December 2, 2022, Big Sur Employees, at Defendants' direction, met in person with C.C. at the Soulard Social House and attempted once again to convince C.C. to verify the false information in GPTS, and also to enter false certified payroll into GPTS. When C.C. continued to refuse, Defendants discussed logging into the GPTS reporting system to verify the false information for C.C.'s WBE without C.C.'s knowledge. On December 7, 2022, **ALSTON** communicated with **CHAKRAVERTY** and a Big Sur Employee via email, "so whats the deal with [C.C.]. Can we just log in and do it for her she would never know." However, Defendants were aware at that time that C.C. had already spoken with representatives of SLDC and voiced concern that Big Sur was providing false information to SLDC and inflating the value of materials and labor actually provided by C.C.'s WBE on SoHo. **CHAKRAVERTY** advised against **ALSTON's** plan, responding via email, "she is already telling [SLDC] that we do this so i wouldn't suggest it." Following that failed attempt to have C.C. verify the false entries in the GPTS reporting system, on December 3, 2022 **CHAKRAVERTY** advised **ALSTON** and a Big Sur Employee via email to find a different WBE company which they could use to verify the false payment information, "[C.C.] has done 40,000 labor…[C.C.] materail (sic) purchase without lien release or entry [in GPTS] 1.6 [Million]…Need to replace 1.6M with a new WBE vendor…."

34.     Defendants' efforts at reporting the falsely inflated information in the GPTS reporting system and in Utilization Reports for WBE and MBE participation on SoHo continued into at least June, 2023.    During April 2023, **CHAKRAVERTY, ALSTON, CAO** and Big Sur Employees reviewed internal Big Sur records which reflected the falsely inflated MBE and WBE numbers which had been reported through the GPTS system to SLDC in an effort to determine how to document those falsely inflated numbers with SLDC.    On April 6, 2023, a Big Sur Employee provided a chart to **CHAKRAVERTY**, **ALSTON**, and **CAO** which reflected actual payments made to SLE of $2,697,611.68, along with the payments made to non-MBE subcontractors through "joint checks" with SLE of $2,153,983.39 which had been falsely credited to SLE's MBE in reporting to SLDC.    The chart reflected actual payments made to C.C.'s WBE of $59,690.00, along with the payments made to non-WBE subcontractors through "joint checks" with C.C.'s WBE of $1,151,810.68 which had been falsely credited to C.C.'s WBE in reporting to SLDC.    The chart reflected the "professional fee" of $4,354.91 actually paid to OC, and the payment made to the non-Native American MBE through a "joint check" with OC of $72,581.76 which had been falsely credited to OC in reporting to SLDC.    On or about May 8, 2023, a final Utilization Report was sent via email by a Big Sur Employee, at Defendants' direction, to **ALSTON**, **CHAKRAVERTY** and SLDC which falsely attributed approximately: (1) $1,150,721.00 in additional material and labor costs to C.C.'s WBE company; (2) $2,248,769.29 in additional material and labor costs, along with the 5% "markup" amount, to SLE's African American MBE; and, (3) $73,000.00 in material and labor costs to OC Native American MBE. On May 18, 2023 a Big Sur Employee asked **CAO** about the discrepancy in Big Sur's reporting to SLDC as to payments purportedly made to C.C.'s WBE, and what Big Sur actually paid to C.C.'s WBE.    **CAO** advised the Big Sur Employee that Big Sur could add the "joint purchase order" amounts to the final lien waiver for C.C.'s WBE, which C.C. had already signed, to make

it look like C.C.'s WBE had actually received that larger amount.   As **CAO** stated, "We can, we can make it look like we paid her, but we didn't actually pay her."   "We have final waiver.   What we normally do is we just put in the paid information on the final waiver which she already signed it."   On June 1, 2023, during a meeting with SLDC representatives which was attended by two attorneys representing Big Sur, **CHAKRAVERTY** continued to falsely represent that Big Sur had made payments to a Native American MBE [OC] which needed to be input into GPTS, and continued to falsely represent the inflated numbers as to African American MBE and WBE utilization on SoHo.

      **City Tax Incentives.**

35.    SLDC relied upon the false information submitted by Defendants in approving SoHo for a sales tax exemption for the cost of materials purchased and utilized in the construction of SoHo, as well as in considering SoHo for property tax abatement. Due at least in part to the ongoing false reporting, as early as September 8, 2022 Big Sur had received in excess of $1,000,000.00 in sales tax exemptions from the City for the cost of materials purchased and used in the construction of SoHo.   Ultimately, Big Sur did not receive the anticipated property tax abatement as a result of SLDC's concerns and continuing questions as to Big Sur's reporting of C.C.'s WBE's purported utilization and participation on SoHo.   SLDC was unaware at that time of the false information reported by Defendants and Big Sur Employees, at Defendants' direction, as to SLE and OC.

36.    Throughout the course of the conspiracy and in furtherance of their fraudulent scheme, Defendants **CHAKRAVERTY**, **ALSTON**, and **CAO** caused email communications to be sent and received in interstate commerce.

      All in violation of Title 18, United States Code, Section 1349.

22

## COUNTS 2 - 12
### Wire Fraud

37.    Paragraphs 1 to 7 and Paragraphs 12 to 36 of Count 1 are realleged and fully incorporated by reference as though fully set forth in Counts 2 to 12.

38.    From at least as early as in or about January 2019 through at least as late as in or about October 2023, in the Eastern District of Missouri and elsewhere,

**SIDARTH "SID" CHAKRAVERTY,**

**VICTOR ALSTON, and**

**SHIJING "POPPY" CAO,**

the Defendants herein, aiding and abetting each other and acting together, along with others known and unknown to the Grand Jury, knowingly and intentionally devised and intended to devise a scheme and artifice to defraud the City of St. Louis, Missouri and the St. Louis Development Corporation and to obtain money and property from the City of St. Louis, Missouri and the St. Louis Development Corporation by means of materially false and fraudulent pretenses, representations, and promises, which scheme is described in substance above in Count 1 of this Indictment.

39.    On or about the dates set forth below, in the Eastern District of Missouri and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, the Defendants knowingly and intentionally transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures and sounds, as described below:

23

| COUNT | DATE | USE OF INTERSTATE WIRE |
|---|---|---|
| 2 | December 2, 2020 | Email from **CAO** to Big Sur Employee stating, "We need to list all materials payments and pay thru [C.C.]." |
| 3 | December 2, 2020 | Email from **CHAKRAVERTY** to **CAO** stating, "We need to get 3.5% - 4% [WBE] pls tell me what we can pay through [C.C.].  thx" |
| 4 | December 23, 2020 | Email from **ALSTON** to Big Sur Employee, **CHAKRAVERTY** and **CAO** approving issuance of a joint check stating, "ok w me" |
| 5 | December 30, 2020 | Email from **CHAKRAVERTY** to **CAO** stating, "Poppy just go ahead and get the joint checks signed off on everything you can thx." |
| 6 | July 1, 2021 | Email transmitting false final lien waiver for C.C.'s WBE on Chelsea to SLDC. |
| 7 | July 16, 2021 | Email from **CAO** to **CHAKRAVERTY** and SLDC transmitting false Good Faith Narrative on Chelsea to SLDC. |
| 8 | April 15, 2022 | Email from **CAO** to **CHAKRAVERTY** and Big Sur Employee stating, "These are the payments we need joint checks.   Pls make sure we don't pay these vendors directly." |
| 9 | April 15, 2022 | Email from **CHAKRAVERTY** to **CAO** and Big Sur Employee, stating "we have to create joint contracts for all of these." |
| 10 | November 8, 2022 | Email from **ALSTON** to **CHAKRAVERTY** and Big Sur Employee stating, "Guys fix this stuff.   We have 5M on the line tomorrow.   this was raised over a month ago bring [C.C.] in and fix it today" |
| 11 | December 7, 2022 | Email from **ALSTON** to **CHAKRAVERTY** stating, "so whats the deal with [C.C.].   Can we just log in and do it for her she would never know." |
| 12 | May 8, 2023 | Email transmitting false final SoHo Utilization Report to **ALSTON**, **CHAKRAVERTY**, and SLDC. |

In violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL.

_____

FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____

HAL GOLDSMITH, #32984(MO)
Assistant United States Attorney