UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24CR489 MTS/SPM |
| | ) | |
| SIDARTH "SID" CHAKRAVERTY, | ) | |
| VICTOR ALSTON, and | ) | |
| SHIJING "POPPY" CAO, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANTS'
MOTION TO DISMISS INDICTMENT FOR FAILURE TO STATE AN OFFENSE ON
GROUNDS OF TRADITIONAL PROPERTY INTEREST**

COMES NOW the United States of America, by and through the United States Attorney for the Eastern District of Missouri, Thomas C. Albus, and Assistant United States Attorney for said District, Hal Goldsmith, and for its Response to Defendants' Motion to Dismiss Indictment for Failure to State an Offense on Grounds of Traditional Property Interest (ECF 158), states to this Honorable Court as follows:

In the instant Motion, Defendants have attempted to reframe the pending Indictment's conspiracy and fraud charges as based upon a "regulatory action" by the City of St. Louis, intertwined with a "right to control" theory of prosecution in order to argue for dismissal of the Indictment upon the purported applicability of *Cleveland v. United States*, 531 U.S. 12 (2000) and *Ciminelli v. United States*, 598 U.S. 306 (2023). However, a review of the pending Indictment, as well as appropriate case law, supports a finding by this Court that Defendants' arguments are without merit, and Defendants' Motion should be overruled and denied.

Defendants submit that the pending charges consist of a conspiracy "to deprive the City of

1

St. Louis of economic information required for tax assessments." That is simply not true and is a misleading effort to shoehorn the actual charges here into the holdings of the cases cited by Defendants. Count One of the Indictment actually charges Defendants with a conspiracy to commit wire fraud by having, "devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false or fraudulent pretenses, representations, or promises … while having used or caused to be used an interstate wire communication, in violation of Title 18, United States Code, Section 1349" (Indictment Paragraph 9). The Purpose and Object of the Conspiracy, as set forth in the Indictment, was "to obtain City tax incentives in the form of sales tax exemptions on the purchase of construction materials, as well as property tax abatements" (Indictment Paragraph 10). Counts Two through Twelve of the Indictment charge Defendants with aiding and abetting wire fraud, having "devised and intended to devise a scheme to defraud the City of St. Louis, Missouri and the St. Louis Development Corporation and to obtain money and property from the City of St. Louis, Missouri and the St. Louis Development Corporations by means of materially false and fraudulent pretenses, representations, and promises … through the use of the wires … in violation of Title 18, United States Code, Section 1343" (Indictment Paragraphs 38 and 39).

The alleged facts and circumstances underlying these charges, as set forth in the Indictment, are straightforward. Defendants Alston and Chakraverty, brothers, owned and operated a number of companies, and Defendant Cao served as their companies' in-house accountant (Indictment Paragraphs 1 and 2). Defendants' companies built two multi-family apartment developments in the City of St. Louis, the Chelsea and the Soho, after which Defendants' companies owned, operated and managed those apartment complexes (Indictment Paragraph 1). In order to reduce the costs of constructing those developments, increase the profit

2

gained from owning and operating those developments, and ultimately to put more money into the Defendants' pockets as owners and operators, Defendants sought and obtained significant tax incentives from the City (Indictment Paragraph 6).    Prior to beginning construction on each of the developments, Defendants obtained Ordinances from the City's Board of Aldermen granting each of those developments those requested tax incentives, primarily in the form of multi-year tax abatements worth millions of dollars to Defendants and their companies (Indictment Paragraphs 12 and 23).    Pursuant to the City's Ordinances and the Redevelopment Agreements which Defendants executed, and as a direct result of Defendants' requests for tax incentives, Defendants' companies were required to make good faith efforts at meeting the City's goals as to the use of minority and woman owned subcontractors on those development projects (Indictment Paragraphs 12 and 23). The St. Louis Development Corporation ("SLDC") was the City Agency charged with overseeing the development projects on behalf of the City, as well as monitoring Defendants' use of minority and woman owned subcontractors on the projects (Indictment Paragraph 5).   The Indictment charges Defendants with conspiring and engaging in a scheme to defraud the City and SLDC, by making false representations in order to obtain money in the form of tax incentives from the City and SLDC (Indictment Paragraphs 9, 10, and 38).   The scheme to defraud and obtain money involved Defendants' falsely inflating their actual use of minority and woman owned subcontractors on the two projects in reporting to SLDC in order to deceive SLDC into believing that Defendants' companies had made good faith efforts at achieving the hiring goals (Indictment, Manner and Means, Paragraphs 11 – 35).  As a result of their conspiracy and scheme to defraud, Defendants and their companies obtained substantial tax incentives in the form of exemptions from sales taxes due and owing the City on the cost of construction materials for both the Chelsea and the Soho, as well as a ten-year property tax abatement on the Chelsea (Indictment Paragraphs 22

3

and 35). Defendants' scheme was discovered prior to the City granting the requested tax abatement on the Soho (Indictment Paragraph 35).

It is important to note that, had Defendants and their companies not engaged in their scheme, and had not falsely represented to have made a good faith effort to meet the City's goals for hiring minority and woman owned subcontractors on both the Chelsea and Soho, Defendants and their companies would simply not have been approved by the City for the substantial tax incentives they sought. They would not have faced any other sanction or unfavorable consequence. This was always about Defendants wanting to lower their costs on their development projects to increase their profit, thereby putting more money into their pockets and into their companies' coffers. Through their conspiracy and scheme, Defendants obtained approximately $551,022.99 in sales tax exemption on materials purchased and used on the Chelsea construction, as well as ten-years of tax abatement on the Chelsea, valued at approximately $1,750.071.88 (Indictment Paragraph 22). Defendants obtained in excess of approximately $1,000,000 in sales tax exemption on materials purchased and used on the Soho construction, and but for their scheme having been discovered, would have obtained ten-years of tax abatement on the Soho, valued at approximately $7,037,714.00 (Indictment Paragraphs 23 and 35).

Under the alleged facts and circumstances set forth in the Indictment, and based upon the pending charges, Defendants' reliance upon *Ciminelli* and its holding disallowing a "right to control" theory of prosecution is misplaced. The Indictment and theory of prosecution in *Ciminelli*, unlike in the instant case, charged defendants with conspiracy to commit wire fraud and substantive wire fraud by having "devised a scheme to defraud Fort Schuyler of its right to control its assets, and thereby exposed Fort Schuyler to risk of economic harm…." (Case Number 1:16-CR-776-VEC, ECF 682-1, Paragraphs 23, 25, and 27). Significantly, because it was charged and

4

prosecuted under the "right to control" theory, the *Ciminelli* Court denied the Government's request on appeal to consider affirming the defendants' convictions "on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory," 598 U.S. 306 at 316-17. Despite Defendant's efforts to frame the instant charges in such a way as to fall under the holding of *Ciminelli*, there can be no question but that the Defendants here had the goal and object of obtaining money from the City, and they did in fact successfully obtain money in the form of significant tax savings on the cost of construction materials and on the cost of property taxes. That was real money in their pockets and in the coffers of their companies that would otherwise, but for their scheme, have been depleted. The instant charges against these Defendants are brought under a "traditional property-fraud theory," not under a "right to control theory." *Ciminelli* does not apply here, and the Indictment as charged should stand.

Defendants' reliance upon *Cleveland v. United States*, 121 S. Ct. 365 (2000) is similarly misplaced here, based upon the charges contained in the instant Indictment, and the underlying alleged facts and circumstances. In an attempt to convince this Court to apply the *Cleveland* holding, Defendants argue that the tax incentives obtained by Defendants through their fraud scheme are analogous to the regulatory licensing program at issue in *Cleveland*. That argument is without merit. The Court in *Cleveland* analyzed the Louisiana video poker licensing statute, which "asserts the State's 'legitimate interest in providing strict regulation of all persons, practices, associations, and activities related to the operation of … establishments licensed to offer video draw poker devised.'" *Id*. at 371. Most significantly, the Court there found that, "as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law." Id. In the instant case, of course, the City was entitled by law to money in the way of tax revenues, as charged

in the Indictment.  Through their scheme, Defendants denied the City of sales taxes due and owing under the law on construction materials used in the Chelsea and Soho developments in excess of approximately $1,500,000.  Further, as to the ten-year tax abatement obtained by Defendants through their scheme relative to the Chelsea, the property taxes assessed were due under the law. As a result of their scheme, those property taxes due and owing were abated for several years before Defendant's fraud scheme was discovered and the Indictment was returned.  Taxes assessed under the law are not analogous to the state licensing at issue in *Cleveland*, and are, therefore, not regulatory in nature.  Taxes due and owing are "property" under the mail and wire fraud Statutes, and because the City was induced to part with those sales taxes and property taxes through reliance on Defendants' false representations, the charges in the Indictment should stand.

Defendants attempt to distinguish the holding in *Pasquantino v. United States*, 544 U.S. 349 (2005) from the instant facts by suggesting that, unlike the liquor excise taxes in that case which were held to be "property," the taxes which Defendants avoided through their scheme here were "discretionary" and somehow not "property."  Defendants suggest that they "never owed and thereby never denied the government any money as a result of their receipt of the tax abatements and exemptions…."  That is simply not true.  As previously stated here, combined on both the Chelsea and the Soho development projects, through the sales tax exemptions they obtained through their scheme, Defendants avoided and denied the City in excess of $1,500,000 in sales taxes already due and owing on materials used in the construction of those apartment complexes. Further, by the time Defendants' scheme was discovered, Defendants had already avoided and denied the City several years of substantial real property taxes on the Chelsea which, but for the success of their fraudulent scheme, would not have been abated and would have been due and owing.  Those real property taxes had already been assessed based upon the construction costs and

6

assessed value of the Chelsea but were abated as a result of Defendants' scheme. Despite Defendants' argument to the contrary, the holding in *Pasquantino* clearly supports the charges contained within the Indictment here.

In *Kousisis v. United States*, 145 S. Ct. 1382 (2025), the Court affirmed wire fraud and conspiracy convictions where Defendants, in securing painting contracts in Philadelphia, made false representations to the Pennsylvania Department of Transportation ("PennDOT") as to Defendants' use of disadvantaged business entities ("DBEs") subcontractors on the projects. PennDOT's DBE program, while specifically related to the letting of contracts, was in other aspects similar to the City's MBE/WBE program at issue in the instant case. The issue before the Court was whether the fraudulent-inducement theory of prosecution met the wire fraud statute's requirements. As the Court stated, "Under the fraudulent-inducement theory, a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim net pecuniary loss." 145 S. Ct. 1382, at 1388. The Court, in finding that the fraudulent-inducement theory involved a Defendant's scheme to obtain a victim's money or property as required under the wire fraud statute, rejected Defendants' argument that there must also be economic loss to meet the requirements of the statute *Id*. at 1391. Significantly, the Court stated, "Rather, the theory criminalizes a particular species of fraud: intentionally lying to induce a victim into a transaction that will cost her money or property." *Id*. at 1398. In the instant case that is precisely what has been charged in the Indictment; that Defendants fraudulent scheme induced the City to enter into the tax incentives which caused the City to forego and lose money in the form of tax revenues due and owing. In holding that the necessity of injury is satisfied with "deception-induced deprivation of property," the Court stated,

7

"an 'injury' has occurred when a fraudster 'obtain[s] from an owner, by a false representation of a fact which he deems material, property which he would not otherwise have parted with upon the terms which he is thus induced to accept.'" *Id*. at 1394, fn. 5 (citing, *Williams v. Kerr*, 152 Pa. 560, 565 (1893). Defendants' scheme here involved materially false representations which resulted in the City parting with significant tax revenues which, but for the false representations, the City would not have done. As charged in the Indictment, it was the object of Defendants' scheme to obtain millions of dollars in tax incentives from the City that they would not have received but for their fraudulent misrepresentations.

WHEREFORE, the United States of America respectfully requests this Honorable Court overrule and deny Defendant's instant Motion to Dismiss, and for such other relief as this Court deems appropriate and proper under the circumstances.

Respectfully submitted,
THOMAS C. ALBUS
United States Attorney

*s/Hal Goldsmith*
HAL GOLDSMITH, #32984MO
Assistant United States Attorney
111 S. 10th Street, 20th Floor
St. Louis, Missouri 63102

## CERTIFICATE OF SERVICE

I certify that on August 4, 2025, a copy of the foregoing was filed in the ECF system.

*s/Hal Goldsmith*
HAL GOLDSMITH, #32984MO